**GENERAL MOTORS CORPORATION,**
**Appellant,**

v.

**Harold L. BRYANT, Appellee.**

**No. 17315.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

May 3, 1979.

Rehearing Denied June 7, 1979.

Vinson & Elkins, Gay C. Brinson, Jr., J. C. Nickens, Houston, for appellant.

Schmidt & Matthews, W. Douglas Matthews, James H. Brannon, Smith & Connor, James Patrick Smith, Houston, for appellee.

Before COLEMAN, C. J., and PEDEN and DOYLE, JJ.

COLEMAN, Chief Justice.

This is a products liability ·case. General Motors Corporation appeals from a judgment based on a jury verdict awarding Harold L. Bryant the sum of $2,400,082.67. General Motors contends that the evidence

is not in law or in fact sufficient to support findings by the jury: (1) that the right rear suspension system of Bryant's 1962 Corvair was defectively designed and that such defect was a producing cause of the occurrence; (2) that the right rear suspension system was defectively manufactured in that a lock washer was not placed on a critical bolt during assembly and that such defect was a producing cause; and (3) that the interior of the automobile was defectively designed in two respects (failure to have a padded sun visor and failure to provide an adequate restraint system) and that such defects were producing causes of the injuries suffered by the plaintiff.

On March 5, 1965, Mr. Bryant had attended a union meeting and was returning to his home in the Corvair automobile on Interstate Highway 10 near the Magnolia Bayou bridge. There is evidence that he passed an automobile driven by Wallace Ellis at approximately sixty-five miles per hour. Bryant proceeded in the outside lane for some distance and then moved into the inside lane. A short time later, Ellis observed Bryant's car swerving and jerking to the left at which time the right rear corner of the car dropped down and the sparks were seen underneath the right rear corner of the automobile. Mr. Ellis stated that he saw the motor cover pop up and the car take a sharp right turn. While these events were occurring, it appeared to him that the right rear wheel was missing or that it was low on the ground. The car then went off the roadway and dropped to a grassy area below the bridge.

Ellis testified that he then stopped his vehicle and ran down the side of the road where he found the car resting on its roof. The front windshield was gone and he found Bryant in the car with a portion of his head and one arm protruding through the windshield area. He attempted to remove him from the car but was unable to do so. When a crowd began to gather, Ellis slipped away before the police arrived because he did not want to be a witness.

No other person purporting to be an eyewitness was produced at the trial. Mr. Bryant suffered brain stem damage in the accident, resulting in partial paralysis and loss of memory. He was unable to testify concerning the cause of the accident. Various expert witnesses produced by the plaintiff and the defendant examined the wrecked automobile and pictures taken of it, as well as the scene of the accident, and attempted to reconstruct the events leading up to the accident and to determine the cause thereof. The expert witnesses presented by General Motors concluded that the Corvair was driven off the highway and over the embankment at a high rate of speed due to driver error and that no mechanical or design defect was a cause of the accident and the injuries to the plaintiff.

Expert witnesses produced by the plaintiff testified that the right rear suspension of the automobile was defective in several particulars and that these defects were in design and could have been remedied at little or no additional cost in such a way as to have prevented the accident. The jury found that the right rear suspension system of the 1962 Corvair was defective as designed.

The jury also found that the right rear suspension system of the 1962 Corvair was defective as manufactured. The jury was instructed to consider only whether or not a lock washer was placed on the alleged missing bolt at the time the car was assembled. The jury's answer to this special issue was supported by the testimony of Mr. Marcosky and Dr. Fowler.

Mr. Bryant's Corvair received its most severe damage in its right rear suspension area. The Corvair automobile was designed with independent suspension systems for each wheel. The motor was located in the rear of the car. Mr. Marcosky reconstructed the accident in order to explain the damage to the right rear undercarriage. From an examination of the automobile, he found that the shock absorber failed when its lower attachment bolts were sheared. It was his theory that all of the right rear undercarriage failures occurred on the roadway and were caused by a missing bolt and a loosened adjacent bolt in the right lower

control arm. Mr. Marcosky was of the opinion that the absence of the one bolt and the looseness of the other caused the right rear lower control arm to move slightly, which caused the right rear wheel to "jack up" and go beyond its full rebound position on the roadway. It was at this point, in Mr. Marcosky's opinion, that the two lower attachment bolts for the shock absorber failed and that the failure of the shock absorber then caused a series of failures of various parts in the right rear undercarriage. Mr. Marcosky felt that the failure of the lower shock absorber attachment bolts caused the car to go out of control.

All of the experts agreed that the two lower attachment bolts for the shock absorber failed when the right rear wheel and half-axle went beyond full rebound position. The critical dispute was whether this occurred on or off the roadway.

Mr. Marcosky testified that the lower control arm was attached by four bolts, two at each end. He stated circumstances that led him to believe that one of the bolts was completely missing prior to the accident and that the other bolt at that end of the control arm was loose. With one bolt missing, a bracket holding the emergency brake cable was held in place by only one bolt which, as a result of vibration over a period of time, had become loose. The lower control arm then was held in place by two bolts at one end and only by one loose bolt at the other end. This permitted some motion in the lower control arm resulting in additional toe-in of the right rear wheel. This put some cornering force on the contact patch of the wheel which pushed it under and caused some positive camber.

Mr. Ellis had testified that when Mr. Bryant started his passing maneuver at about sixty-five miles an hour, his vehicle made a sharp turn to the left and it looked like it was going to go all the way over. Mr. Marcosky theorized that the car had started to slide sideways and tipped up on its side because of the cornering force developed from the extra toe. As this happens, the force on the wheel is very high and it rolls underneath the car. He testified that when the tuck under occurs, the car momentarily loses traction and goes into a full-over position when the shock absorber is fully extended. In his opinion, at this time the rear shock attachment bolts failed because they are just too little, and the shock is pulled through the lower control arm. There is then nothing to hold the lower control arm from going down underneath the car, and when it reaches a certain distance, the spring is no longer retained and it pops out. The lower control arm reaches a point where it binds, and the universal joint comes in contact with the retaining nut from the differential housing.

At that point, according to Mr. Marcosky, everything is locked. The loose bolt connecting the lower control arm to the crossmember is pulled out. The differential is pivoted up into the engine bay compartment breaking the right transmission lug mounts and the engine moves up into the engine bay compartment causing the carburetor to come in contact with the spare tire, pushing it against the right rear deck lid and popping it up.

Mr. Marcosky states that all of these things happened in a very short time and resulted in lost power and brakes and inability to control the car.

Dr. Gary Fowler, a metallurgist, testified that he found failures which were consistent with the reconstruction of the accident as testified to by Mr. Marcosky. He testified that 1550 pounds of force would be required to pull out the lower shock attachment. This figure was obtained through use of the diameter of the bolts and the strength of the material. He used the "typical strength for that threaded fastener of that nature" in making his calculation. He also testified that he did not know the material from which the bolt was made, and that he was estimating the shear strength to be 25,000 pounds per square inch. He also testified that there was a variable, but he did not think it could be twice 25,000 pounds per square inch in that he had not experienced that amount in a fastener. He calculated the lateral force that would be generated in a "jacked up" position by cal-

culating the force required to overcome the coefficient of friction on the pavement. In answer to a question as to how much force would be generated by a normal passing maneuver at sixty-five miles an hour, he stated that he was not certain he could describe a normal passing maneuver. He testified that a force of approximately 1,298 pounds would be required to skid the wheel, but that considering the load on the car and the load caused by the spring tension, there was a total force of 1625 pounds on the shock absorber. He stated that these calculations were made on the basis of static loads and that there could be dynamic loads placed on the system that would add to the static loads. He reached the final conclusion that every time the Corvair exceeded the coefficient of friction while in the full rebound position and in a slightly jacked up position the shock absorber would fail.

To counter this testimony an expert witness employed by the defendant, Mr. Tom Bundorf, testified that the plans and specifications for the 1962 Corvair specified that the bolts which retained the lower end of the shock absorber into the control arm were made of GM–280–M steel. He testified that those steel specifications mean that they are made of high strength steel and that the minimum strength of those bolts would be 92,000 pounds per square inch. He calculated that the shear yield stress of the bolt would be normally 52,000 pounds per square inch and that the two bolts would carry a load of 5,495 pounds before shearing.

Appellant asserts that the accident could not have occurred in the manner plaintiff's experts postulated because they assumed that the cornering force on the right rear tire was sufficient to shear the bolts that held the shock absorber to the lower control arm of the car's frame. General Motors asserts that Fowler considered a fact contrary to the evidence in assuming that the upper shear limit of the shock absorber bolts was 25,000 pounds per square inch. This assertion rests on General Motors assumption that the shear strength of the bolts is established as being in excess of 50,000 pounds per square inch by Mr. Bundorf's testimony and calculations. Dr. Fowler's testimony is in some respects inconsistent with the mathematical calculations of Mr. Bundorf. Mr. Bundorf's testimony as to his calculations does not establish them as being correct. The record does not reflect that Mr. Marcosky depended upon information as to the shear strength of the bolts given him by Dr. Fowler in reaching his conclusions.

The various expert witnesses explained their theories and findings in detail to the jury. Their findings were buttressed by various exhibits, pictures and mathematical calculations which were carefully explained to the jury. Mr. Marcosky's testimony was consistent with the testimony given by Mr. Ellis, the eyewitness. This testimony was accepted by the jury and fully supports the answer made by the jury to special issue 1, and also supports the answer made to special issue 2.

■ As the court stated in *Luttes v. State*, 159 Tex. 500, 324 S.W.2d 167, 189 (1958) "[w]hile, in a limited sense, all testimony may involve opinions of the witnesses, the proof here was peculiarly of the 'opinion' or 'expert' type, and the occasion has to be at least highly exceptional when such testimony, even though not contradicted by an opposing expert, must be deemed true as a matter of law."

■ The opinions of an expert as to deductions from facts is never binding on the trier of facts, even though not contradicted by an opposing expert. *Gregory v. Texas Employers Insurance Association*, 530 S.W.2d 105 (Tex.1975).

General Motors' points of error numbers 1 through 18 will not be sustained since we are of the opinion that the evidence was sufficient to support the answers made by the jury to special issues 1 and 2. We do not reach General Motors' points of error numbers 19 through 42, which attack findings of the jury relating to the doctrine of "crashworthiness" for the reason that the judgment of the court can be sustained based on the jury's answers to special issues 1 and 2 and the damage issues.

General Motors' points of error numbers 43, 44, 45 and 46, complain of the wording of special issue number 1. The issue inquired whether the right rear suspension system of the 1962 Corvair was defective as designed. In connection with this issue an instruction was given in these words:

"You are instructed that you shall consider only the following items in determining whether or not the right rear suspension system on the 1962 Corvair in question was defectively designed and none others: use of lock washers rather than castellated nuts with cotter pins or self-locking nuts on the attachment bolts located on the right rear lower control arm; the absence of a rebound strap; the use of the particular shock absorber attachment bolts and shock absorber on the car in question; the absence of a camber compensator; and the location and attachment of the bracket for the emergency brake cable to a bolt which also secured the right rear lower control arm to its supporting cross-member."

General Motors contends that this instruction suggests that there was a missing bolt and a loose bolt because of the uncontradicted evidence that there would be no need for the various "fail-safe" devices like the rebound strap and the strengthened shock absorber unless one bolt was missing and the other was loose. Mr. Marcosky testified that the missing bolt acting together with the loose bolt set in force the chain of circumstances which resulted in the accident. He testified that had the shock absorber bolts been stronger or had the car been equipped with rebound straps the accident would not have occurred.

Numerous authorities have held that a jury issue which assumes a controverted fact constitutes an impermissible comment on the weight of the evidence. *City of Houston v. Cash*, 483 S.W.2d 513 (Tex.Civ. App.-Houston [1st Dist.] 1972, writ ref'd n. r. e.).

Rule 277, Tex.R.Civ.P., was amended effective September 1, 1973, to read in part as follows: "The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers, but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers where it is properly a part of an explanatory instruction or definition."

It was necessary that the judge confine the jury to matters raised both by the pleadings and the evidence in its determination of the ultimate issue submitted by special issue number 1, that is, whether the right rear suspension system was defective as designed. The instruction given accomplished this objective.

There was a conflict in the expert testimony as to whether a bolt was missing and the adjoining bolt was loose prior to the accident. General Motors asserts that this fact question should have been submitted to the jury and that special issue number 1, should have been predicated on an affirmative answer to that issue.

Rule 277, supra, permits the trial court, at its discretion, to submit broad general issues to the jury. *State v. Norris*, 550 S.W.2d 386 (Tex.Civ.App.-Corpus Christi 1977, writ ref'd n. r. e.). Evidentiary issues should not be submitted to the jury. The ultimate issue was whether the right rear suspension system was defective as designed. Whether there was a missing bolt and a loose bolt was merely evidentiary. *Lambert v. H. Molsen & Co., Inc.*, 551 S.W.2d 151 (Tex.Civ.App.-Waco 1977, writ ref'd n. r. e.).

It appears that the instruction was included in the charge by the trial court in an attempt to comply with the requirements laid down by the Supreme Court of Texas in *Scott v. Atchison, T. & S. F. R. Co.*, 572 S.W.2d 273 (Tex.1978). There the Supreme Court said:

" . . . if the listing of the relevant acts or omissions in the broad ultimate fact issue should be cumbersome, complicating, or otherwise undesirable, the requirement may be met by a complimentary instruction along the following lines: 'In your determi-

nation of the above question you shall consider only whether the railroad company was negligent in failing to have the necessary culverts or sluices at or near Bridge 46.3, or [here listing any other acts or omissions raised by the pleadings and the evidence upon the new trial]'."

Rule 277, supra, was amended in 1973 for the specific purpose of permitting simpler and broader submissions of controlling issues. The giving of the limiting instruction in this case was within the discretion of the trial court. The comment on the evidence produced thereby, if any, was not direct but incidental only and was a proper part of an explanatory instruction.

In his voir dire the attorney for the plaintiff stated:

"There is another reconstruction expert that was hired by General Motors, a Mr. Frank Weaver, who is an engineer locally who had examined this automobile and scene and ended up with a different reconstruction theory about this case." Apparently General Motors objected to this statement during an unreported discussion at the bench on the ground that it violated a motion in limine. The motion in limine and the court's ruling thereon do not appear in the record. The trial court sustained the objection and instructed the jury not to consider that remark. It appears to be uncontroverted that Mr. Weaver examined the automobile at the request of General Motors and made numerous photographs of the automobile and various parts thereof. Many of these pictures were admitted into evidence and identified as pictures taken by Mr. Weaver. At various times during the trial he was identified as a General Motors expert without objection.

■ While it has been held that an attorney may comment in his argument on the failure of the opposite party to call a witness employed by him, it has also been held that the attorney may not undertake to tell the jury what testimony that witness would give. *Tex-Jersey Oil Corporation v. Beck*, 157 Tex. 541, 305 S.W.2d 162 (1957). The remark by plaintiff's attorney that Mr. Weaver ended up with a different reconstruction theory was clearly improper. Since the trial court instructed the jury not to consider that remark, harmful error is not shown.

General Motors introduced evidence that the plaintiff had been drinking shortly before the accident, that beer and liquor were found in his car after that accident, and that several persons smelled alcohol on his breath. The plaintiff introduced evidence that he had consumed about two bottles of beer and was in full control of his faculties prior to the accident. Dr. Samuel Feducia treated the plaintiff when he reached the hospital after the accident. Hospital records prepared by him indicated "suspect patient inebriated". This portion of the hospital record was excluded by the trial court. The defendant offered testimony on a bill of exception that the doctor stated in a deposition that he had information from an unnamed friend of the patient that the plaintiff had been drinking heavily and the car overturned. The doctor testified that he did not remember who the friend was. The doctor also testified on the bill of exception that he could smell the odor of alcohol on the plaintiff's breath and it smelled to him like beer. There was also testimony that a Dr. Sharkey had examined the plaintiff and had detected the odor of alcohol on his breath.

The testimony is undisputed that the plaintiff had been drinking beer prior to the accident. Dr. Feducia testified that all he knew was that he smelled beer on the plaintiff's breath. No blood alcohol test was given to Mr. Bryant and Mr. Bryant was not able to walk or talk.

■ Article 3737e, Tex.Rev.Civ.Stat. authorizes the admission into evidence of business records once a proper foundation has been laid. It is necessary that it be established that it was the regular course of that business for an employee or representative of such business, with personal knowledge of the act, event or condition to make the record or to transmit information to be included in the record. This provision requires the exclusion of a statement in a

hospital record from an outside source as to how an accident happened. The opinion of a qualified expert in the field of his qualification recorded in a hospital record is admissible in those instances where it can be said that the diagnosis records a condition resting in reasonable medical certainty. *Loper v. Andrews*, 404 S.W.2d 300 (Tex. 1966); *Skillern & Sons, Inc. v. Rosen*, 359 S.W.2d 298 (Tex.1962).

■ The medical opinion of a doctor recorded in hospital records by the doctor or someone to whom he has conveyed the opinion that a patient was drunk would ordinarily be admissible into evidence. However, in view of Dr. Feducia's testimony that his diagnosis was made on the basis of an unnamed witness' statement and the fact that the plaintiff smelled of beer, the trial court properly refused to admit the statement into evidence. In any event the refusal to admit this bit of testimony would not constitute a reversible error. It is unlikely that a jury would credit a doctor's opinion that a patient was drunk if it were known that this opinion was based solely on the fact that the doctor could smell beer on the patient's breath. The notation made in the hospital records by Dr. Feducia: "suspect patient inebriated", does not amount to a medical opinion. Since it was merely a comment and was speculative in nature, the fact that the comment was recorded in the hospital records would not render the comment competent evidence.

In points of error No. 50, 51, and 52, General Motors complains about certain remarks made by plaintiff's counsel in his final argument. Plaintiff's counsel argued in effect that since the court had not submitted anything in its charge concerning drinking or concerning negligence on the part of the plaintiff, the fact that plaintiff might have been drinking was not significant. The statement was made: "if there was sufficient evidence to base that issue, you would be asked the question . . . that's just like what happened on the drinking. There wasn't any evidence, so the court didn't submit an issue to you." In effect, the argument was that since no issue

on contributory negligence was submitted to the jury, the conduct of the plaintiff had no bearing on the issues submitted.

The argument or a similar one was made on three occasions. The first two occasions provoked no objection on the part of counsel for General Motors.

"The general rule with respect to improper argument is well settled: a party must object to it at the time it is made and his objection must be overruled; it is only when the probable harm or the resulting prejudice cannot be eliminated or cured by retraction or instruction that a new trial will be awarded in the absence of a timely objection." *Brown v. Friedman*, 451 S.W.2d 588 (Tex.Civ.App.-Houston [1st Dist.] 1970, no writ).

■ The last time the argument was made the plaintiff's counsel was attempting to equate the argument with one made by defendant's counsel concerning punitive damages. Plaintiff's counsel argued that "there wasn't any evidence so the court didn't submit an issue to you." At this time an objection was made which was sustained by the trial court and the jury was instructed not to consider the remarks. The prejudice, if any, resulting from this argument was cured by the admonition of the trial judge. *Younger Brothers, Inc. v. Myers*, 159 Tex. 585, 324 S.W.2d 546 (1959).

Another argument to which objection was made and sustained by the court related to a written statement made by the witness Ellis to the attorneys for the plaintiff. This written statement was not made available to counsel for General Motors. While Mr. Ellis was on the stand he was asked whether or not he thought it would be fair and equitable to give the ladies and gentlemen of the jury an opportunity to see the statement and he replied that it would "probably be fair to them but it would not be fair to me". He also stated in answer to a question "it might be different, but if it is different, the only one that is going to look bad is me." Counsel for plaintiff then stated before the jury that he would offer the statement in evidence if counsel for General Motors would stipulate that it was admissi-

ble. An objection was made and sustained by the court.

█ In argument to the jury, counsel for General Motors repeated the statements and argued: "folks, when you come down to the court house, you don't need to leave your common sense at home. Now, I don't know why it wouldn't be fair to Mr. Ellis and I don't know why it would look bad to him, but as I say, you, ladies and gentlemen, nor have we had an opportunity to see what he made in a statement a year after this accident did occur." In answer to this argument plaintiff argued that "they did not want it in evidence" and that "they refused to have this statement in evidence but they want to beat us over the head with it as if he had told something different. He's told you exactly what he said, exactly—." We consider that this argument was invited, the trial court sustained the defendant's objection, but no instruction to disregard the argument was asked or given to the jury. Reversible error is not presented. *Texas Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856 (1954); *Tennison v. Letto,* 469 S.W.2d 287 (Tex.Civ.App.-Austin 1971, writ ref'd n. r. e.).

█ Plaintiff's counsel also made the following argument:

"Mr. Brinson made a big point of the fact the damage issue is not predicated, is not based on any of the other issues, you answer it separately. I will just say this. If you don't answer a defect in issue number 1, 2, or 3, and the "producing cause" for that defect, then school is out for Mr. Bryant." This argument informed the jurors of the effect of their answers and appealed for an answer favorable to the plaintiff. The argument was clearly erroneous. *Houston, E. & W. T. Ry. Co. v. Sherman,* 42 S.W.2d 241 (Tex.Comm.App.1931, holding app'd); *Magic Chef, Inc. v. Sibley,* 546 S.W.2d 851 (Tex.Civ.App.-San Antonio 1977, writ ref'd n. r. e.).

This was a lengthy trial lasting some three weeks, and the issues were rather clearly drawn. From the arguments made, the jury could hardly have failed to as-

certain the manner in which the attorneys for the plaintiff and the defendant desired them to answer the issues. The argument was not so harmful as that it probably caused the rendition of an improper judgment. *Magic Chef, Inc. v. Sibley,* supra.

We are not in sympathy with efforts of counsel to deliberately violate the rules of proper jury argument for the purpose of gaining an advantage and then argue that the case should not be reversed because no prejudice to the opposing party resulted therefrom. However, the Supreme Court of Texas has interpreted Rule 434, Tex.R. Civ.P., as requiring this court to determine before reversing a case that the error be such that it "was reasonably calculated to cause and probably did cause the rendition of an improper judgment." In interpreting this test the Supreme Court stated:

"The true test is the degree of prejudice flowing from the argument—whether the argument, considered in [the] proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Texas Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856 (1954).

After considering all of the asserted instances of improper argument in light of the record in this case we are unable to conclude that the argument was so harmful that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

The judgment is affirmed.