**WAGNER & BROWN, Jack E. Brown and Cyril Wagner, Jr., Appellants,**

v.

**E.W. MORAN DRILLING COMPANY, INC., Appellee.**

No. 2–84–246–CV.

Court of Appeals of Texas, Fort Worth.

Jan. 30, 1986.

Lynch, Chappell, Allday & Alsup, Randall Lundy and Harper Estes, Midland, Sherrill & Pace, Roy T. Sparkman, Wichita Falls, for appellants.

Sanders, Masters, Watson & Brown, Marvin H. Brown, Banner, McIntosh & Dobbs, Jack Banner, Wichita Falls, for appellee.

Before FENDER, C.J., and ASHWORTH and JOE SPURLOCK, II, JJ.

## OPINION

FENDER, Chief Justice.

This is an appeal from a judgment in a daywork drilling contract case in favor of E.W. Moran Drilling Company, Inc. appellee—plaintiff, hereafter "Moran", against Wagner & Brown, Jack E. Brown and Cyril Wagner, Jr., appellants—defendants, hereafter "Wagner & Brown". Moran sued upon a printed and typewritten daywork drilling contract providing for payment of $11,000.00 per day, alleging that the fixed term of the contract was for 550 days and that Wagner and Brown only paid for 430 days and were thus liable for 120 days payment, totalling $1,320,000. Wagner and Brown asserted numerous defenses including unilateral mistake as to the term provision of the contract and illegality and usury with respect to the interest charged in the contract. Immediately prior to the trial they sought leave to amend their pleadings to allege Moran's failure to perform certain conditions precedent and upon denial of leave to amend, requested a continuance, which was denied. The judgment awarded Moran $1,111,000.00 with prejudgment and post-judgment interest of 18% and attorney's fees of $107,975.00 with additional fees of $25,000.00 and $15,000.00 in the case of appeal to the Court of Appeals and the Supreme Court. The forfeitures and penalties sought on Wagner & Brown's claim of usury were denied.

We affirm.

In considering the forty-three points of error presented we shall treat them as grouped for discussion in appellee's brief. We deem it necessary to a full understanding of our disposition of these points that the record as to the negotiations and execution of the contract document, the document itself, and the parties performance under it, be summarized.

Moran has been in the oil and gas drilling business in Wichita Falls since 1950. Wagner & Brown are engaged in exploration, drilling and production of oil and gas with headquarters at Oklahoma City. During the time from August 1980 to August 1981 there was a great deal of drilling activity in Western Oklahoma so that the demand for drilling rigs was heavy and the only rigs available which were capable of drilling to depths of 24,000 feet were new rigs coming out of construction.

Wagner & Brown were desirous of drilling a well to a depth of 24,200 feet and wanted a rig capable of drilling to that depth and another thousand feet if needed. Moran was approached about the availability of such a rig in January of 1981. After negotiations between Jack D. Semon, operations manager of Wagner & Brown and E.W. Moran, Jr. and Eric Zepp, Moran's contract manager, a written contract was prepared by E.W. Moran, Jr., utilizing a standard printed form captioned "International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contact—U.S.," and mailed to Semon who signed it on behalf of Wagner and Brown. The agreement was signed by Moran on February 27, 1981 and by Semon on March 12, 1981.

The basic contractual provisions of the document upon which this dispute arises are found within the first six of its paragraphs and in addition, paragraph number 21. As edited those provisions and their material elements follow:

**1. LOCATION OF WELL:**

Well Name and Number: ~~Lone Fork~~ #1

P~~X&W~~ County: Kiowa   State: Oklahoma   Field Name: WILDCAT

Well location and land description: _____

1.1 Additional Well Locations or Areas: __Well, or wells, to follow if 18 month drilling commitment is not fulfilled on above well.__

Locations described above are for well and contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

**2. COMMENCEMENT DATE:**

Contractor agrees to use best efforts to commence operations for the drilling of well by the approximately September 30 to October 30 day of _____ 19 81 or as soon as Rig 30 is completely rigged up and ready to move to first location.

**3. DEPTH:**

3.1 Well Depth: The well(s) shall be drilled to depth of approximately __25,000__ feet, or to the _____ formation, whichever is deeper, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of __25,000__ feet, unless Contractor and Operator mutually agree to drill to a greater depth.

**4. DAYWORK RATES:**

Contractor shall be paid at the following rates for the work performed hereunder.

* 4.1 Mobilization: Operator shall pay Contractor a ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ a mobilization day rate of $ __11,000__ * per 2X~~XX~~ day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: __All time from arrival on location to the time of spud.__

* 4.2 Demobilization: Operator shall pay Contractor a ~~XXXXXXXXXXXXXX~~ ~~XXXXXXXXXXXXXXXXX~~ or a demobilization day rate during tear down of $ __11,000__ per ~~XXXX~~ day, provided however that no demobilization fee shall be payable if the contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: __tear down after rig release and setting off location__

* 4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on __N/A__ Operator shall pay Contractor a sum of $ __11,000__ per ~~XXXXXXXXXXX~~ day.

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with __5__ man crew the operating day rate shall be:

| Depth Intervals | | Without Drill Pipe | With Drill Pipe |
|---|---|---|---|
| From 0 | To TD | $ 11,000 * per day | $ 11,000 * per day |
| | | $ _____ per day | $ _____ per day |
| | | $ _____ per day | $ _____ per day |

Using Operator's drill pipe $ __11,000 *__ per day.

* "Day" during this period shall mean work day and does not infer a 24-hour period.

\* \* \*

Operating rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

4.5 Repair Rate: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, while Contractor is performing daywork hereunder, Contractor shall be allowed compensation at the applicable daywork rate for each period of shutdown time up to a maximum of __8__ hours for any one repair job and a total of __24__ hours for each thirty (30) day period. Thereafter, Contractor shall be compensated at a rate of $ __0__ per twenty-four (24) hour day. __Normal rig service, cutting drilling line, and changing pump expendables__ shall not be included in computing the number of hours of shutdown time.

4.6 Standby Time Rate with Crews: $ __11,000 *__ per twenty-four (24) hour day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator. __The standby rate without crews is $11,000 per 24-hr. day.__

4.7 Force Majeure Rate: $ __11,000 *__ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions for force majeure as defined in Paragraph 16 hereof. It is, however, understood that Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

\* \* \*

**5. TIME OF PAYMENT:**

Subject to Operator's right to require Contractor to furnish him with satisfactory evidence that Contractor has paid all labor and material claims chargeable to Contractor, payment becomes due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable day rates, and all other applicable charges shall be due upon acceptance by Operator of the work performed in accordance with this Contract, upon presentation of invoice therefor upon completion of mobilization, completion of the well, or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed

to Operator at address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows:

Same as Page 1 of the Contract

**5.2** Any sum or sums not paid within _____30_____ days after the date of invoice shall bear interest at the rate of _____1.5_____ percent per ___month___ or the maximum legal rate, whichever is less, from such date until paid.

**5.3** Attorney's Fees: If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or probate proceedings, then Operator agrees that there shall be added to the amount due reasonable attorney's fees and costs.

**6. TERM:**

**6.1** Duration of Contract:This Contract shall remain in full force and effect until drilling operations are completed on the well or wells specified in Paragraph 1 above, or for a term of _____ commencing on the date specified in Paragraph 2 above.

**6.2** Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by _____

**6.3** Early Termination:

(a) By Either Party: Upon giving of written notice, either party may terminate this Contract when conditions of force majeure, total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event Operator shall reimburse Contractor as set forth in sub-paragraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provision of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, Contractor may, at his option, elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in subparagraph 6.4 hereof. In addition to Contractor's right to terminate performance hereunder. Operator hereby expressly agrees to protect, indemnify and save Contractor harmless from any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's joint venturers, or other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such termination of performance hereunder.

**6.4** Early Termination Compensation:

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty a sum equal to the Standby Rate With Crews without (Article 4 6) for a period of _____550_____ days ~~of XXX%%%XXX XXXXXXXXXXXXXXXXXXXX~~

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig. (2) Ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle his rig and equipment provided however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the force majeure rate less any unnecessary labor from that date subsequent to termination upon which Contractor completes dismantling his rig and equipment until the end of the term or _____

(c) If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable daywork rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for ___actual___ days at the applicable day rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus a lump sum of $___N/A___ provided, however, if this Contract is for a term of more than one well or for a period of time. Operator shall pay Contractor, in addition to the above, the force majeure rate less any unnecessary labor from the date of termination until the end of the term or _____

(See Paragraph 21.1)

* * *

**21. SPECIAL PROVISIONS:**

21.1  In that the full initial term of this contract is for a period of eighteen (18) months (550 days), the standby rate without crew will apply for each day the rig is not on an operating status for the Operator. Should the Operator terminate this contract before the eighteen month term is fulfilled, the Operator shall be obligated to the Contractor to pay the daily standby rate without crew (paragraph 4.6) until this eighteen month term contract is concluded; however, the Operator will not be charged the standby rate without crew for periods of time that this Contract is assigned to a third party operator at the same rates as outlined in Paragraph 4.1 through 4.7 of this Contract. Notwithstanding Paragraph 19 above, Operator will not be liable to Contractor as guarantor of the performance of the assignee if written approval of the Contractor is given for the assignment of this Contract.

21.2  It is agreed by Wagner and Brown and E. W. MORAN DRILLING COMPANY, INC. that the actual number of days required to move and rig up E. W. MORAN DRILLING COMPANY, INC. Rig 30 from MORAN's Wichita Falls yard to Wagner and Brown's first location will be billed at the moving and mobilization rates as outlined in Paragraph 4.3 and 4.1 of the Contract plus actual costs of trucking and crane service as outlined in Paragraph 6.11 of Exhibit "A" of the Contract.

All subsequent moves to the first well will be billed in the same manner except that Wagner and Brown and E. W. MORAN DRILLING COMPANY, INC. agree that the maximum number of days required for subsequent moves and rig up will be negotiated.

Upon receipt of the signed contract, Moran began to firm up orders for parts and machinery needed to construct the rig. The rig had not been completely fabricated in Moran's yard by mid-November when Moran was told by Wagner & Brown to move the incomplete rig to the drilling site and to complete its construction there. Moran complied, moved onto the drilling site, completed construction of the rig and began drilling (spudded) on December 12, 1981. Continuous drilling took place for 430 days and had reached a depth of approximately 22,000 feet by February 15, 1983. Prior thereto, on January 24, 1983, Wagner & Brown wrote to Moran pointing out that there had been a decrease of activity in the oil and gas industry and since "the contract signed was at a competitive industry rate, there should be a reduction in the rate, to a competitive industry rate." It was requested that Moran "reduce the contract day rate charged, on the referenced well, to a competitive industry rate; with said day rate charge to be effective and retroactive to September 15, 1982". Moran replied by letter of January 26, 1983, stating that in order to meet the unprecedented demand for rigs, Moran had to finance the purchase of equipment at prevailing prices to construct the rig and that its costs were remaining constant although market day rates had declined sharply, and that any change in contract terms would result in its being in default under its loan agreement since it was based almost exclusively on its contracts for the use of the rigs.

Well operations were ordered to cease on February 15, 1983; by Wagner & Brown. Moran then rigged down, removed from the site and on March 11, 1983 forwarded its standby rate invoice for the balance of the month of February and again tendered its rig # 30 "for further operations pursuant to the contract made with your company." The rig was not further utilized by Wagner & Brown. Moran continued to send monthly invoices for the period of 120 days subsequent to the cessation of drilling on February 15, 1983. The invoices were not paid and suit followed to collect the day rate of $11,000.00 for the 120 day period. That period of time represents the difference between the 430 days of drilling operations after spudding on December 12, 1981, and the 550 days provided for in the contract.

There is no dispute that the term of the contract is 550 days, but the primary dispute arises out of the disagreement as to the commencement date of the 550 day term. Wagner & Brown contend that the date of the execution of the contract (March 12, 1981) marks the commencement date, but that no payment would be due until work on the well started, whereas Moran urges that the commencement date is the date of the beginning of drilling operations (December 12, 1981), and that it should be paid $11,000.00 per day from that date, whether or not the rig was in use, for the full 550 days.

Neither party claim ambiguity in the contract terms and Wagner & Brown urge that it should be construed as a matter of law to the effect that the 550-day term began on the date both parties had signed it, that the 550 day term had long since expired when drilling operations ceased, and since they had paid for every day of actual drilling, together with moving, mobilization and demobilization, they owed nothing more to Moran. Its first four points of error are based upon the failure of the trial court so to find, including its failure to grant motions for instructed verdict and judgment N.O.V.

Wagner & Brown submit in their brief, with supporting authorities, the following propositions of contract law, all of which are embraced by Moran:

A. The Court is required to consider the entire wording of the contract, the surrounding circumstances and applicable legal rules of contract construction

and determine therefrom the meaning of the contract.

B. The Court should interpret the instrument from its four corners as a whole.

C. The Court should construe contract language according to its plain meaning, unless a contrary intention clearly appears.

D. The Court should construe the contract such that no provision is meaningless.

E. The Court may consider deletions and omissions in the contract.

F. The Court may consider the expression of a matter in writing as the exclusion of another.

G. The Court may construe the contract against its author in case of doubt as to meaning of the writing.

H. The Court should not construe a writing contrary to common sense.

I. The Court should not oppressively construe a writing.

In the application of the above principles to the contract before us, we find that, under paragraph 2, the drilling operations were to commence when rig # 30 is rigged up and ready to move to the first location; that under paragraph 4.3 Moran was to be paid the moving rate during the time the rig is in transit to the drill site at the rate of $11,000.00 per day and mobilization day rate for all time from arrival on location to the time of spud at the rate of $11,000.00 per day; and under paragraph 4.2, demobilization at the same rate, for rig tear down and setting off location; that the operating day rate to be paid under paragraph 4.4 ("will begin when the drilling unit is rigged up at the drilling location ... and ready to commence operations") is $11,000.00 per day, and the same rate applies under paragraph 4.6 to standby time with or without crews and in the event of early termination of the contract by Wagner and Brown under paragraph 6.3(b); the special provisions of paragraph 21.1 require payment of the daily standby rate of $11,000.00 per day for the balance of the eighteen month (550 day) contract unless the contract is assigned by Wagner & Brown to another operator at the same rates.

The contract provides that Moran is to be paid for a minimum of 550 days, whether it be used in actual drilling or not. This is clear from the provisions of paragraph 21.1 that "the full initial term of this contract is for a period of eighteen (18) months (550 days)." Such term is contemplated by the language of paragraph 1.1 to the effect that additional well locations will follow "if 18 month drilling commitment is not fulfilled on above well." Paragraph 21.1 clearly establishes liability to pay the daily standby rate to the end of the eighteen month term in the event of early termination after spudding and finally, there is a clearly expressed agreement that liquidated damages for termination of the contract prior to commencement of operations are calculated on the basis of the full 550 days, as found in paragraph 6.4(a).

■ Wagner & Brown argue that the 550 day term began to run when the contract was signed and that must be so because if it did not, there would be no starting date from which to calculate the 550 days specified in the liquidated damages provision for termination prior to commencement. We do not agree. The applicable contract provision calls for the payment of a "sum equal to the Standby Rate without Crews for a period of 550 days." The sum referred to is simply the product of multiplication of 550 by $11,000.00 without regard to a starting date.

It is further contended that unless the contract clearly requires it, the court should not construe it to mean that the parties agreed to act contrary to what common sense and the circumstances would indicate. Here, it is argued, common sense dictates that one does not contract to pay for work not actually performed and this contract does not clearly show that Wagner & Brown contracted for a guaranteed minimum of paid days. It is pointed out that Wagner & Brown anticipated that only 300 to 330 days would be required to drill the well and it would be contrary to common sense for them to bind themselves to pay

for 550 days. We note in this regard that paragraph 1.1 contemplates the use of the rig at another location "if 18 month drilling commitment is not fulfilled on above well." In view of the scarcity of available rigs, we cannot say that a guaranty of 550 days in this contract is against common sense. Nor can we say that it is against common sense for Moran to require a committment of 550 days to be paid for use of a brand new rig which cost between seven and eight million dollars to build at a time of peak demand for such rigs.

Finally, Wagner and Brown state that "a contract should be construed against its author", citing *Austin Co. v. Vaughn Building Corporation*, 643 S.W.2d 113 (Tex.1982) and *The Republic National Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109 (Tex. 1978). In the latter case the full rule is stated as follows:

In Texas a writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the apparent intent of the parties. If two constructions are possible, a construction rendering the contract possible of performance will be preferred to one which renders its performance impossible or meaningless (citations omitted.)

We find that the trial court, in construing this admittedly unambiguous contract to mean that the parties agreed to a commitment of 550 paid days for the use of Moran's rig, reached a reasonable result. The result is consistent with the apparent intent of the parties. Any other construction would render the term conditions meaningless. Appellants' points one through four are overruled.

By points of error numbered five through eleven it is claimed that the trial court erred in submitting Special Issue No. 3 and Special Issue No. 4 and that there is no evidence or insufficient evidence to support the jury's answers to either special issue. In considering these points we think it appropriate to consider all of the first four special issues. They are as follows:

SPECIAL ISSUE NO. 1
Do you find that E.W. Moran Drilling Co., Inc. commenced its operations for the drilling of the Bill Troub well within a reasonable time following October 30, 1981?
Answer "They did" or "They did not"
Answer: They did
SPECIAL ISSUE NO. 2
Find from the evidence the date on which Rig # 30 was rigged up and capable of commencing operations on the Bill Troub well.
Answer by giving the day, month and year.
Answer: December 12, 1981
SPECIAL ISSUE NO. 3
Find from the evidence the number of days, if any, during the 18 month (550 day) term after the date Rig # 30 was rigged up and capable of commencing operations, that Rig # 30 was not on an operating status for Wagner & Brown.
Answer by stating the number of days.
Answer: 101
SPECIAL ISSUE NO. 4
What date do you find from a preponderance of the evidence did the 550 day term of the contract begin to run?
Answer with month, day and year.
Answer: November 27, 1981

Where the challenge to a jury finding is framed as an "insufficient evidence" point, we are to consider all the evidence in the case, both that in support of and that contrary to the finding, to determine if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If the court so determines, the finding should be set aside and a new trial ordered. *Id.*

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See International Armament Corporation v. King*, 686 S.W.2d 595, 597 (Tex.1985);

*Stodghill v. Texas Employers Insurance Association,* 582 S.W.2d 102, 103 (Tex. 1979); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In Re King's Estate,* 244 S.W.2d at 661–62.

■ The contract, in paragraph 2 entitled "Commencement Date," provides: that (Moran) agrees to use best efforts to commence operations for drilling by "approximately September 30 to October 30, 1981 or as soon as Rig 30 is completely rigged up and ready to move to first location." It is without dispute that Moran began to move Rig 30 to the well location on November 27, 1981. The first activity calling for payment to Moran is that of moving to the drill site under the provisions of paragraph 4.3. Such facts are deemed ample to support the jury finding to Special Issue No. 4 that the 550 day term of the contract began to run on that date.

■ Since the move began on November 27th and drilling began on December 12th, a date also not disputed, there were fifteen days intervening for moving, rig up and mobilization, according to the calendar in the record. It was stipulated that 430 days of drilling took place. Between February 16, 1983 and February 19, 1983, four days were devoted to rig down, demobilization and moving off the well site, according to the record. Arithmetically, the figure of 550 less the sum of 430, 15 and 4 is 101. During the trial there was strenuous cross examination of Moran's witnesses designed to show that Wagner & Brown had not been given credit for moving, mobilization and demobilization in the calculations leading to Moran's claim that 120 days remained on the committment to pay. The record is clear that in addition to paying for the entire 430 days of drilling operation, Moran had been paid all sums that it had invoiced for moving to the well site, rigging and mobilization, rigging down, demobilization and moving off. The jury apparently gave full weight to Wagner & Brown's reduction theory, deducted nineteen days and arrived at the answer of 101 days to Special Issue No. 3. Again, we find ample evidence to support the finding.

■ Having found that the trial court did not err by failing to find as a matter of law that the 550 day period did not commence with the signing of the contract, we perceive nothing objectionable in the court then submitting the question to the jury as to whether the 550 days began on a date so that it included the days utilized for moving, rigging and mobilization for all of which Wagner & Brown were obligated to pay at the same rate as for drilling. Since Wagner & Brown present no persuasive argument nor authority in support of its contention of error in submitting the special issues designed to resolve the question of credits against the 120 days sought by Moran, points of error five through ten are overruled.

■ Point of error eleven claims that it was error to submit Special Issue No. 3 over the objection that it constituted an impermissible comment on the weight of the evidence and thereby assumed the controverted fact that was submitted to the jury in Special Issue No. 4. It is clear that the language of Special Issue No. 3 did inform the jury that the 550-day term began at the time when the rig was capable of commencing operations. This is precisely the construction of the contract which the trial court was authorized to make and apparently did make, when it rejected Wagner & Brown's claim that the 550 day term began when the contract was signed. Point of error eleven is overruled.

■ Points of error number twelve through fourteen present the claim that Moran should have been required to secure a jury finding on whether there existed mutual assent as to each material term of the contract. Wagner & Brown requested a special issue as to whether the parties did not have a meeting of the minds with respect to the term provision of the contract. It was refused.

The record shows that there are generally four types of drilling contracts in use in

the industry; day-work, term day-work, footage and occasionally, turn-key. The footage contract provides for payment for each foot drilled at an agreed rate per foot, with the contractor guaranteeing to reach a specific minimum depth. The turn-key contract provides for a single, lump sum payment where the contractor assumes all responsibility to provide the materials and services to drill to a specific minimum depth. The day-work contract provides that the contractor goes to the location with his rig and is paid for every day that the rig is there. In such instances, the moving and mobilization charges are billed when the contractor is rigged up and ready to drill and thereafter, usually on a monthly calendar basis, day-work charges are billed plus any charges for demobilization. The term day-work contract provides for a specific amount of time during which the contractor receives payment for services.

Moran's evidence was to the effect that if it were to build a rig which would cost between seven and eight million dollars it would have to count on a certain "stream of income" and for that reason, in its dealings with Wagner & Brown, it insisted on a term day-work arrangement and was trying to get a commitment of two to three years. Wagner & Brown's response to Moran's offer of a two year term contract was "we did not like term drilling contracts. Didn't believe in them. ... we didn't want a two-year drilling contract." Subsequently, Moran offered an eighteen month term and indicated that eighteen months was the least that it had to have. After that offer, Moran tendered the instant contract by a letter of transmittal identifying the document as an "Eighteen Month Term Contract." During the approximately two weeks period, from the time Wagner & Brown received the document until it was signed, their representative Semon read it several times, studied it, and was aware of all of its terms and provisions when he signed it. Under these facts, we do not perceive that an issue is required regarding the meeting of the minds as to the obligation of Wagner & Brown to pay Moran for a minimum of 550 days following the construction of rig # 30 and its commitment to Wagner & Brown's drilling operation. In *Enos v. Leediker*, 214 S.W.2d 694, 696 (Tex.Civ.App.—Galveston 1948, no writ) it is stated:

> [I]t is sometimes loosely stated that it is essential to the formation of a contract that there be a meeting of the minds of the parties to it. What is meant and understood by the statement is, that there must be a meeting of the minds of the parties as expressed in the contract. There is manifestly no way of knowing whether there has been a meeting of the minds of the parties except from the expressions used in the contract. Even in a verbal contract, if there is no dispute as to the terms used in a contract and they are unambiguous, it is a question of law for the court to determine whether the minds of the parties met. And in the case of a written contract, the writing is the contract in contemplation of law, and the court must determine from it whether there has been a meeting of the minds, ....

Points of error twelve through fourteen are overruled.

Points of error fifteen through twenty involve the affirmative defense of unilateral mistake and the jury findings and failure to make findings related to that defense. Over objection that such issues were not supported by pleading or evidence, special issues No. 7 and No. 8 were submitted, inquiring if Jack Semon, Wagner & Brown's agent, was mistaken in his belief concerning the date of beginning of the 550 day term and if so, whether such mistake was not made in the exercise of ordinary care. The jury found that Semon was mistaken in that regard but that the mistake was not made in the exercise of ordinary care, therefore the remaining issues relating to unilateral mistake were not answered.

■ If the submission of such issues were proper, a question we do not here decide, we hold the evidence sufficient to support the questioned jury finding. There

was testimony, not contradicted, that the daywork drilling contract for a fixed minimum period of time was generally known and widely used. From the beginning, the evidence shows that Moran was insistent on a minimum fixed term contract if it undertook to build a new rig. Semon was told initially that the minimum term would probably be around three years, which was later reduced to two years and finally agreed as eighteen months. Semon was not inexperienced in the industry. He had ample time to study the written contract before signing it. He testified that he sought clarification of the 550 day feature in a conversation in his office in Oklahoma city with Moran's representative, Zepp, as described below:

> [I]n my mind the contract started the day of signature, the 550 days. Mr. Zepp indicated or told me that they would not hold our feet to the fire on this. Now, my main concern was from the time that the 550 days triggered, which in my opinion was the date of signature.
>
> \* \* \* \* \* \*

Zepp testified that the meeting described never took place and he never made such representation to Semon. The jury found that Zepp did not make such a representation. There is nothing in the record that Semon sought clarification of the matter elsewhere.

In the light of Semons expression of concern but failure to inquire or clarify exactly when his company would be obligated to begin paying $11,000 per day for 550 days, if the jury believed he was mistaken in his belief, the jury was justified in finding that his mistake was not made in the exercise of ordinary care. Points of error fifteen through twenty are overruled.

We do not reach points of error twenty-one through twenty-five which attack the submission of, and answers to, two special issues presenting Moran's theory that Wagner & Brown were estopped to claim that the contract did not provide for 550 days of drilling operations, for the reason that the judgment of the court can be sustained based on the jury's answers to other special issues and without regard to the two special issues under attack. *See General Motors v. Bryant*, 582 S.W.2d 521, 525 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

■ Points of error twenty-six, twenty-seven and twenty-eight relate to two instances in which Wagner & Brown objected to jury argument of Moran's counsel as being outside the record. In each instance the objection was sustained and the jury was instructed to disregard. No further relief was requested. Wagner & Brown acknowledge that their points of error can be sustained only if we determine the following:

1) that the argument constituted error;

2) the error was not invited or provoked;

3) the error was preserved by proper trial predicate;

4) the error was not curable by instruction, prompt withdrawal or reprimand by the Judge;

5) that the argument by its nature, degree and extent constituted reversibly harmful error; and

6) the error's probable effect on a material finding.

*Standard Fire Insurance Company v. Reese*, 584 S.W.2d 835 (Tex.1979).

We believe the above quotation from the brief to be misleading unless read with the following additional language from the opinion regarding the seventh element:

7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. [Citations omitted.]

*Id.* We are impressed with the admonition of the Supreme Court in the cited case that

"there are only rare instances of incurable harm from improper argument," and, having applied that standard we find that this case is not one of such rarities. We overrule points of error twenty-six, twenty-seven, and twenty-eight.

The next three points of error assert that it was an abuse of discretion for the trial court to deny Wagner & Brown's motions to amend their pleadings prior to, and during the course of the trial. At a pre-trial hearing on May 15, 1984, Wagner & Brown requested, and were granted, permission to file a Fifth Amended Answer alleging usury. At the same time the trial court set a pleading deadline of May 18th, 1984, and a firm trial setting for July 9, 1984 was agreed to and ordered. On July 9, 1984, the day of trial, counsel for Wagner & Brown sought permission to again amend their pleadings "with respect to the issue of performance or nonperformance of the conditions precedent" stating, "we have discovered this morning that apparently our pleadings are insufficient to put that in issue." Upon objection by Moran, the motion to amend was denied. Thereafter, during the course of the trial, Wagner & Brown, on six occassions, offered trial amendments, each of which was stated orally to be the same or similar to the amendment offered at the beginning of the trial.

■ Rule 166[1] allows a trial court to set a time within which all amendments to pleadings must be presented. The rule provides further that such an order, where entered, shall control the subsequent course of the action unless modified so as to prevent manifest injustice. Wagner & Brown urge that they should have been allowed their sixth pleadings amendment on the eve of the trial under the provisions of Rule 63 which states that untimely amendments may be permitted with leave of court and that such leave should be granted unless there is a showing that the amendment would operate as a surprise to the opposite party. We have no difficulty in reaching the conclusion that the record amply supports the surprise factor.

Since Moran had pled performance of all of its obligations under the contract, under Rule 54, it would be required to prove only such of them as were specifically denied. Wagner & Brown had specially denied only that Moran provided a rig within a reasonable time and that such failure was a breach which excused any failure to perform on the part of Wagner & Brown. Consequently there had been no necessity to make preparations to prove all of the details of Moran's performance during the 430 days it was on the job or to prepare a defense to allegations that it had failed to perform any of the "conditions precedent." To be required on the day set for trial to make such justifiably unexpected trial preparations would have operated as a surprise to any plaintiff. We have previously upheld the imposition of a deadline for filing pleadings under Rule 166. *See Griffin v. Wolfe*, 626 S.W.2d 895, 897 (Tex.App.— Fort Worth 1981, no writ), *see also Valdez v. Lyman-Roberts Hospital, Inc.*, 638 S.W.2d 111, 117 (Tex.App.—Corpus Christi 1982, no writ). We find no abuse of discretion in the refusal of the trial court to permit the sixth amendment of pleadings. Moreover, the infirmity which characterized the offer of the pleadings amendment on the eve of trial had not lessened at the times when the same vague amendments were offered later as trial amendments. Points of error twenty-nine, thirty and thirty-one are overruled.

Points of error thirty-two through forty-three attack the denial of forfeiture and penalty recovery for usury to Wagner & Brown and the award of 18% pre-judgment and post-judgment contractual interest to Moran.

■ In the judgment before us, the court stated that the matter of usury as a defense is controlled by Federal law, including 12 U.S.C.A. Section 86a, and in the

---

1. All references to Rules are to Vernon's Texas Rules of Civil Procedure Annotated unless otherwise specified.

alternative, is controlled by the law of the State of Oklahoma and that the rate of interest contracted for is proper, lawful and applicable to the judgment under all relevant law. We do not reach the question of whether Oklahoma law governs because we agree "that the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C.A. Section 86a, as amended, preempted Texas law to allow a contractual rate of interest greater than that allowed by the Texas statute in effect at the time." The enactment provides the following:

Sec. 86a. Interest on business and agricultural loans of $1,000 or more

(a) Discount rate on ninety-day commercial paper

If the applicable rate prescribed in this section exceeds the rate a person would be permitted to charge in the absence of this section, such person may in the case of business or agricultural loan in the amount of $1,000 or more, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any such loan, *interest at a rate of not more than 5 per centum in excess of the discount rate, including any surcharge thereon, on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the person is located.* (Emphasis Added)

Wagner & Brown do not dispute such proposition of law but they *do* urge that the computation of the rate of interest allowed under the federal act depends upon the determination by the trier of fact of the applicable discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve District where the plaintiff resides. They then assert that in this case there is no pleading or proof of the applicable discount rate in force at the appropriate time and that such rates are not the proper subject of judicial notice by the court. Consequently, it is claimed, the court was unable to properly determine whether the 18% interest figure

fell within the rate allowed by the federal act.

Moran counters by saying that such judicial notice is authorized and required by TEX.R.EVID. 201 and 202 and that the trial court had been furnished sufficient information to enable it to properly take judicial notice. Rule 201 follows:

(a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary. A court may take judicial notice, whether requested or not.

(d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.

(g) Instructing Jury. The court shall instruct the jury to accept as conclusive any fact judicially noticed.

In the record we find the pertinent discount rate information as follows: (1) Federal Reserve Bank of Dallas Circular No. 80–231, dated December 5, 1980, including Supplement A to Bulletin No. 2 as part thereof, which provides:

The Federal Reserve Bank of Dallas discount rate for ninety-day commercial paper is 13% per annum effective December 8, 1980;

and (2) the Federal Reserve Bank of Dallas Circular No. 81–92, dated May 4, 1981,

including Supplement A to Bulletin No. 2 as part thereof, which provides:

The Federal Reserve Bank of Dallas discount rate for ninety day commercial paper is 14% per annum effective May 5, 1981.

As to the propriety of the court taking judicial notice of such information we are cited no Texas cases nor do we find any. We do know however, that TEX.R.EVID. 201 is derived verbatim from the same numbered federal rule of evidence, and that federal courts have construed their rule to permit judicial notice of long-term corporate Aaa bond interest rates as reflected in Federal Reserve Bulletins. *See United States of America v. 97.19 Acres, More or Less, Located in Montgomery, Washington, and Allegany Counties, Maryland,* 511 F.Supp. 565, 56 A.L.R.Fed. 470 (1981).

In another case involving the interest rate to be applied to the difference between the condemnation award and the estimated compensation paid into the court, it was written:

[T]he cases have utilized a variety of methods to calculate the interest rate to be applied.... Assuming that a proper formula could be determined, the City presented no evidence from which to calculate the applicable interest rate. 1

The footnote reads:

1. Apparently, other courts have simply taken judicial notice of such publications as the Treasury Bulletin, the Federal Reserve Bullentin and Moody's Composite Index of Yield on Long Term Corporate Bonds. *See e.g. Miller [v. U.S.],* 620 F.2d [812] at 840 [224 Ct.Cl. 352]; *97.19 Acres,* 511 F.Supp. at 569; *5.00 Acres,* 507 F.Supp. at 599. *United States v. 50 Acres of Land, More or Less, Situated in Dallas County, State of Texas,* 529 F.Supp. 220, 224 (1981).

We understand this opinion to at least tacitly approve the taking of judicial notice but requiring some information to be submitted to the court as a basis for such notice taking as dictated by Section (d) of Rule 201.

In another Texas federal case, where the court apparently acted under Section (c), Rule 201, and took judicial notice without specific information upon which to base the notice, it was written:

[T]herefore, the court will award interest on the deficiency at the per annum interest rate applicable to three-year Treasury bonds.[8] Purchased on the date of taking, for the period from and including March 7, 1978, to the date of payment of the award. The task of calculating the exact amount of the judgment will be left to counsel who will also submit an appropriate judgment....

The footnote reads:

8. This datum appears in the *Treasury Bulletin* and the *Federal Reserve Bulletin,* both of which should be readily accessible to counsel.

*United States v. 5.00 Acres of Land, More or Less, Situated in Orange County, State of Texas,* 507 F.Supp. 589, 599 (E.D. Tex.1981).

We believe that the Legislature intended to retain the meaning of the federal language when it adopted it verbatim in Rule 201. We also note, that in 1981, as indicative of the trend towards facilitating proof of such generally recognized financial data, our legislature provided that any court may take judicial notice of interest rate ceilings as published in the Texas Register. *See* TEX.REV.CIV.STAT.ANN. art. 5069–1.04, sec. (k)(3) (Vernon Pamp.1986). We therefore hold that the discount rate on ninety-day commercial paper in effect at a Federal Reserve bank is a proper subject for the taking of judicial notice by reference to appropriate Federal Reserve Bulletins. We may presume that the trial court took judicial notice of such discount rates for the applicable periods of time. *See Harper v. Killion,* 162 Tex. 481, 348 S.W.2d 521 (1961); *Continental Oil Co. v. Simpson,* 604 S.W.2d 530, 535 (Tex.Civ. App.—Amarillo, 1980, writ ref'd n.r.e.). Thus, the maximum rate of interest during 1980 was 18% and for the period beginning May 5, 1981 was 19%, and the 18% contractual interest in this case was not usurious

but, to the contrary, could, and should have followed a delinquency in payment of any sum due to Moran under the contract. Points of error thirty-two through forty-three are overruled.

We now consider Moran's single cross-point to the effect that it is entitled to recover for the full 120 days that the rig was not on an operating status. What we have written in discussing Wagner & Brown's points of error five through ten is dispositive of the contention and the cross-point is overruled.

Having found no error, we affirm the judgment.