MOORE, J.
JjThe operator, E & Pco International (“E & Pco”), appeals' a judgment finding that it breached its daywork' drilling contract with the contractor, NorAm Drilling Co., by failing to pay any amount due under the contract, and ordering E & Pco to pay $2.01 million plus contractual interest and reasonable attorney fees. • We affirm.

Factual Background

The key players in E & Pco were its president, C.E. Edwards, and its vice-president, Osman Kaldirim Jr., exploration geologists who had formerly worked for CDX Gas but left to form their own companies, including E & Pco, for the purpose of evaluating projects for CDX. Later, Osman Jr.’s father, Osman Kaldirim Sr., joined the company, and E & Pco’s lawyer, Bob Leidich, of Jones-Day in Houston, acquired an interest in it.
In late 2007, E & Pco bought two leases in coalbed methane fields in Louisiana, including a tract in Caldwell Parish (the I.P. No. 3). All E & Pco’s witnesses stressed that at the time, E & Pco had virtually no capital, but it badly wanted to secure an operator for the LP. No. 3 while the market was prime. Edwards and Osman Jr. were very impressed with the Super Single Rig, with a long horizontal reach,. being made by N or Am.
NorAm is a subsidiary of a Norwegian company, Global Rig. The key players in NorAm were its president, Bruce Seeley, its vice-president and chief operating officer, Herman Mclnnis, another partner, Steiner Bakke, and the CEO of Global Rig, Jan Skaara. In December 2007, NorAm had just finished building three Super Single Rigs. Mclnnis testified that this model of rig was ideally suited to the needs of coalbed methane drilling 12in Caldwell Parish and was not available from any other drilling contractor at the time.
' The record shows that Edwards (E <& Pco) and Bakke (NorAm) began exchanging emails in August 2007, with Bakke responding that it was his “responsibility to ensure that the rigs get a signed operating contract as soon as possible.”

The Addendum

On December 6, 2007, before any contract :was signed, Leidich emailed Edwards, Osman Jr. and Osman Sr., stating, “We will also , need an agreement with whomever [sic] is funding the deposit— how is this to be repaid?” He attached a document labeled “Addendum to ContRact Dated DecembeR _ 2007 By and Between E & Peo LLC and NorAm Drilling Company Dated DecembeR 4,2007.” At the time, no contract had yet been signed, and there is no evidence that .the Addendum was forwarded to anybody at NorAm, but it reads, in -pertinent part,, with emphasis added: ,
Notwithstanding anything to the contrary in this Contract, the Parties agree as follows: .
1. On or before November 20, 2007, E & P or its designee shall deposit One Million U.S. Dollars ($1,000,000) (“De- . posit”) to an account at_to serve as a *1064 fund against which payment of invoices submitted to E & P by NorAm for services and materials, all of which will- be in proper.form, may be drawn on the due date thereof. * * *
2. In the event the Deposit is not timely made, NorAm shall immediately cause and direct that the ■ Deposit be refunded to E & P by wire transfer to an account designated by E & P.
3. In the event the deposit is not timely made, this Contract shall terminate and be of no further force or effect | nand neither Party shall have any liability or obligation to the■ other nor in connection herewith (“Termination”).
[[Image here]]

The Daywork Contract

The following day, December 7, .2007, E & Pco (through Edwards) and NorAm (through Seeley) executed a Drilling Bid Proposal and Daywork Contract (“the Daywork Contract”). A standard-form International Association of Drilling Contractors document, the Daywork Contract obligated NorAm to commence operations for drilling by December 15, 2007, “or a mutually agreed date by both parties,” for a period of one year, and specified the use of Rig No. 2. • It further obligated E & Pco to pay a day rate of $22,500 per day, a “moving rate” of 90% of the day rate, and to pay all invoices within 30 days of receipt. The contract contained the notation, “see special provisions,” and attached to it was a handwritten document labeled Exhibit A, § 7 (“the Escrow Clause”):
An escrow account to be established up to an equivalent $ amount to cover mob [mobilization] and demob [demobilization] & int plus 3 months of operation.
Both sides concede this was a part of the Daywork Contract. Osman Jr. testified that Bakke insisted on the Escrow Clause because NorAm knew E & Pco did not have any funds’ to begin with; Osman Jr. estimated the escrow would need to be $2.5 million. All witnesses agreed that E & Pco never paid a dime into escrow, and Mclnnis testified that NorAm never demanded that the Escrow Clause be satisfied.
Early Dealings and the . Email Agreement
Mclnnis testified that after the Daywork Contract was signed, he started asking Edwards and other E & Pco people when he could move RigLNo. 2 to the IP. No. 3 site, but they kept putting him off. Initially, they were preparing the pad and laying the road to the remote site; mostly, however, E & Pco was waiting on funding to start actual operations. Mclnnis testified that at all times, Rig No. 2 (or its exact replica,. Rig No. 3) was ready to mobilize, with its fully trained crew (at a payroll of $7,000.a day, $140,000 a month).
On January 16, 2008, Seeley emailed Edwards, advising that “NorAm cannot simply sit around and wait for your permit or money problems to be solved.” He offered to put Rig No. 2 on a standby rate of $15,500, effective January 21, for 14 days, and if the rig was not mobilized at the end of the 14 days, they would “sit down and discuss the entire situation.” On January 18, Edwards responded, reminding Seeley of the “circumstances surrounding the signing” of the Daywork Contract that it was “contingent upon a required Letter of Credit or Escrow Deposit in the amount of $l,000i000[,]” which was never met by the deadline; as a'result, E & Pco personnel “were surprised” by the email proposing to “meliorate losses occasioned by the delay[.]” He acknowledged NorAm’s' “unusual efforts to hold the rig for E & Pco’s project” and the “inconvenience and potential economic impact[,]” but said E & Pco intended “to do whát is right for all parties[.]”
*1065 A month later, on February 18, Seeley emailed Edwards, stating “my understanding that we have agreed” that the Day-work Contract would cover Rig No. 3, and that “it will go on a standby rate of. $15,000 per day commencing Monday, February 11,2008, and continue thereafter on a daily Ubasis until such time as the Rig is ready to move to the first location under the contract[.]” On February 21, Edwards responded by email:
This e-mail response acknowledges E & Pco’s request to place NorAm # 3 rig on standby @ $15,000 per day. I have discussed this with Mac Mclnnis [No-rAm’s vice-president] and copied him by e-mail.
Seeley testified that with this exchange, referred to at trial as “the Email Agreement,” he authorized charging E & Pco the standby rate of $15,000 a day starting February 11.

Further Dealings and the Letter Agreement

E & Pco was continuously unsuccessful in getting the funding it needed. Osman Sr. graphically described his globetrotting efforts to woo investors in his native Turkey, in Australia, and finally (long after the Daywork Contract expired) in Kuwait. All the while, E & Pco people were telling NorAm that the funding was just around the corner. Needless to say, E & Pco never called on NorAm to mobilize the rig, and the rig (with its crew) never left the yard in' Houston, Texas.
On May- 27, 2008, Seeley wrote a letter (sent as an email attachment) to Edwards, advising that NorAm had been standing by for six months: “To date, we have received absolutely nothing but fruitless promises.” Even at the standby rate, the outstanding balance by the end of May would be $2,182,500, and NorAm expected E & Pco to meet its commitments. On June 2, Leidich emailed Mclnnis and Seeley to say E & Pco was “in. the final stages of securing financing” and that while there are never any guarantees, he knew of no reason the financing deal would- not “go off track.”'
UOn June 25, 2008, Seeley sent a paper letter to Edwards, referring to “previous discussions” and their agreement to certain terms: (1) E & Pco would allow No-rAm to rent out Rig No. 3 to other operators, in an effort to mitigate E & Pco’s costs; (2)- the Daywork' Contract was “in full force ánd effect,” and NorAm would continue on standby; and (3) E <& Pco would continue to-seek'funding. The next day, June 26, Edwards'signed this letter, “acknowledged and agreed to,” on behalf of E & Pco. The parties referred to these documents as “the Letter Agreement.”
In spite of the Letter Agreement, nothing changed. E & Pco never called on NorAm to mobilize a rig; NorAm remained on standby and generated monthly invoices based on the $15,000 a day standby rate; and E & Pco never paid anything.
E & Pco eventually got funding from Kuwait and drilled on the I.P. No. 3, but used another contractor.

Procedural History

NorAm filed this suit in April 2009, in the Louisiana 37th JDC, seeking damages of $4.9 million. NorAm named both E & Pco LLC, the parent company, and E & Pco International LLC, the entity that actually signed the Daywork Contract, as defendants. The parent company obtained dismissal via summary judgment, which this court affirmed. NorAm Drilling Co. v. E & Pco Int’l LLC, 48,591 (La.App. 2 Cir. 12/11/13), 131 So.3d 926. The district court found, and this court agreed, that the contract selected Texas law, which rejects “single business enterprise liability.”
l7The parties proceeded to trial over two days in October 2013. In addition to the *1066 facts outlined above, • Herman Mclnnis (NorAm’s vice-president) testified that under. a daywork contract, the contractor commits a rig to the operator for a stated day rate. The rig and crew are ready to mobilize at any time. Because of this, the contract provides for charges to accrue even when the operator is not using the rig.
Testifying for E & Pco, Osman. Sr. was adamant that everyone understood that if E & Pco could not get its funding, there was “no contract, period.” He was also indignant that even though E & Pco never used the rig, NorAm expected to be paid. Osman Jr. testified that although Seeley and Mclnnis did not sign the Addendum, they were aware of it and agreed to it. He added that through this whole period, E & Pco was “desperate.”
Bob ,Leidich, E & Pco’s attorney and investor, actually testified for NorAm on rebuttal. He admitted there was no evidence that the Addendum was ever submitted to NorAm, and .conceded that the Letter Agreement seémed to validate the contract, even though E & Pco never funded the escrow account.
In addition to the live witnesses, the parties filed the depositions of Edwards, Seeley, Skaara and others; copies of all the emails and letters; copies-of NorAm’s invoices to E -& Pco, as well as to other operators, to show offset; and copies of NorAm’s contracts with other operators.

Action of the District Court

In May 2014, the court issued a 1()½-page opinion finding that the Daywork Contract was indeed in existence and its starting date was ^February 11, 2008, per the Email Agreement. The court did not addréss E <& Pco’s argument that the Day-work Contract never started because E & Pco failed to fund the escrow account, but it found that E & Pco’s conduct from December -2007 through June 2008 was inconsistent with any claim that it had no obligation under the contract. The court calculated damages at the standby rate of $15,000 a day from February il through June 25, 2008, for a total of $2,010,000, plus contractual interest of 1 ½% per month, attorney fees of $259,675 and' costs of $25,142.
Judgment was rendered on August 26, 2014. E <& Pco took this devolutive appeal, raising four assignments of error.

Discussion: The Escrow Clause

By its first assignment of error, E & Peo urges the court committed manifest error in finding that the contingency funding agreement was the unsigned Addendum, without, addressing the real agreement, the signed Escrow .Clause, which was part of the Daywork Contract and initialed by both parties thereto. By its fourth assignment, E & Pco urges the court committed manifest error in finding that the Daywork Contract was in full force while at the very same time giving no weight to the Escrow Clause.
In support, E & Pco reiterates the narrative it tried to convey at trial: everyone knew going in.that E & Pco was searching for funding; both parties initialed the Escrow Clause; NorAm’s vice-president, Mclnnis,' acknowledged that the Escrow Clause had to be met before the Daywork Contract could commence; Mclnnis then “falsely” testified that NorAm could waive that provision; since the escrow account was never funded, I ¡¿here was no contract at all. E & Pco also argues that it was inconsistent for the court to find the Day-work Contract in full force and effect, but not to enforce the Escrow Clause. It submits. that the more reasonable finding would be that the Daywork Contract simply never became effective, and E <& Pco has absolutely™ liability.
*1067 NorAm concedes that the copy of the Daywork Contract that it offered at trial (Trial Ex. P-5) was missing1 Exhibit .A, which contained the Escrow Clause, but shows that it supplied this in its posttrial brief. NorAm also shows that E & Pco’s copy of the Daywork Contract (Trial Ex. D-l) included Exhibit A, and the district court fully considered it, utilizing it in the reasons for judgment.
NorAm’s position has merit. The district court closely analyzed‘the Addendum, finding that it was (1) drafted' by E & Pco’s attorney, (2) incomplete, as the name of the depositary institution was never inserted, and (3) never signed or initialed by anyone at NorAm. The court rejected the thesis that the Addendum was part of the Daywork Contract, labeling it “a fact of which the Court is not convinced[.]” In light of this finding, it is disingenuous for E & Pco now to argue that the court erred in finding that the Addendum was the escrow agreement; the court explicitly found it was not. The first assignment of error lacks merit.
The district court did not- expressly ■ address the Escrow Clause,-but implicitly found that it was part of the Daywork Contract. The Escrow Clause stated merely that an escrow account was “to be established up to an equivalent $ amount to cover-mob and demob int plus 3 months of I. (.operation.” This is in sharp contrast to'the Addendum, which stated that the entire agreement would terminate, along with all the obligations it created, if E & Pco failed to deposit the escrow. Under Texas law, the Escrow Clause does not on its face create a condition precedent for the existence of the obligation. Sun Exploration & Prod Co. v. Benton, 728 S.W.2d 85 (Tex.1987). Even if it did, Texas law is clear that the party in whose favor a condition precedent is established may waive it. . Id; Garza v. Southland Corp., 836 S.W.2d 214 (Tex.App.-Houston 14th 1992). NorAm’s conduct after the parties signed the Daywork Contract,-including its many communications, the Email Agreement and the Letter Agreement, show a perfect willingness to perform even without the protection of the Escrow Clause. And; despite E & Pco’s strained argument to the contrary, the Escrow Clause was obviously intended to benefit, NorAm, by assuring payment of day rates ranging, from $15,000 to $22,500, and not to benefit E. & Pco. The district court’s implicit finding that the Escrow Clause was, part of the Daywork Contract, and that NorAm waived it by subsequent conduct, is reasonable on this record. The fourth assignment of error does not present manifest, .reversible error.

Validity of Subsequent Agreements

By its second, assignment of error, E ■<& Pco urges the court committed manifest error in finding that the Email Agreement (February 21, 2008) constituted a confirmation of NorAm’s prior email to the effect that the parties had a mutual agreement to commence the contract effective February 11, 2008. By its third assignment, E & Pco urges the court committed Inmanifest error in finding that the Letter Agreement (June 26, 2008) constituted an admission by E <& Pco that the contract had commenced effective February 11, 2008. The argument is strictly a claim of manifest error, that the court’s interpretation of the emails and letter is unreasonable. ,
In support, E & Pco parses the February-2008 emails, particularly Seeley’s language, “once we start to move, the provisions of [the Daywork Contract] shall apply[,]’’ and Edwards’s .response that “acknowledges 1 & Pco’s request to place NorAm #3 rig on standby @ $15,000 per day.” E <& Pco urges this *1068 was too tentative to constitute an activation of the contract. Instead, it contends, the only effect of this exchange was to reduce the standby rate from $22,500 to $15,000 per day and to specify that once mobilization was requested, NorAm could provide Rig No. 3 instead of Rig No. 2. It submits that Edwards’s response cannot amount to ratification of the Daywork Contract, as modified.
The district court noted that in addition to the passage selectively quoted above, Seeley’s ‘ email stated, “It is my understanding that we have agreed that NorAm Rig 3, which is covered by [the Daywork Contract], will go on a standby rate of $15,000 per' day commencing Monday, February 11, 2008[.]” The court further found that if E & Pco disputed that the contract had commenced on February 11, 2008, “it did not reflect that position in its response and acknowledgment.” See-ley’s email plainly states the parties’ agreement for NorAm to start charging, and for E & Pco to start paying, the new standby rate effective February 11; nothing in 'Edwards’s email disputed or attempted to alter this. Moreover, Edwards referred to E & Pco’s ]^request to place Rig No. 3 on standby, indicating that he and E & Pco still wanted NorAm to perform. The district court’s- interpretation of- these emails is perfectly. reasonable. The second assignment does not present manifest, reversible error.-
Finally, E & Pco urges that the district court misconstrued the' Letter Agreement as “unilaterally” fixing the start date on-February 11, 2008. E & Pco contends that properly construed, the letter showed only that NorAm was still aware of E & Pco’s -financial situation, NorAm would look for other work for Rig No. 3 and credit that work to E & Pco, and once E & Pco--got its funding, it would indeed use one of NorAm’s rigs.
As noted, Seeley sent. Edwards a demand letter on May 27, 2008, citing E & Pco’s “fruitless promises,” stating that E & Pco’s accrued invoices ■ totaled $2,182,500, and -advising that NorAm would take “whatever legal actions is [sic] necessary to protect its rights under the contract.” Leidich replied that E & Pco was “in the final stages of securing financing from a large entity” and “looks forward to closing the transaction [with the large entity] ASAP.” Nothing in this response denied the validity of NorAm’s claim.
Seeley’s followup letter, June 25, stated, “It is agreed that certain Daywork Drilling Contract by and between E & Pco and NorAm dated December 7, 2007 is in full force and effect[.]” The following day, Edwards signed this letter, under the typewritten notation, “Acknowledged and AgReed To This 26th Day of June, 2008/E & Pco INTERNATIONAL, LLC.” A plain reading of this exchange fully confirms the district court’s finding 113that “nothing in that letter indicates that [E & Pco] did not consider the contract to be in force.” On this record, we detect no manifest error in the court’s finding.
Texas law recognizes the right of parties to modify a- contract by the use of letter agreements. Wes-Tex Tank Rental Inc. v. Pioneer Natural Res., 327 S.W.3d 316 (Tex.App.-Eastland 2010), and citations therein. A letter agreement alters only those terms of the original agreement to which it refers, leaving intact any unmentioned portions of the original agreement that are not inconsistent with the modification. BACM 2001-1 San Felipe Rd. v. Trafalgar Holdings I, 218 S.W.3d 137 (Tex.App.-Houston 14th 2007). As a result, the new contract includes the new, modified provisions and the old, unchanged ones. Wes-Tex Tank Rental, supra, and *1069 citations therein. Moreover, Texas law specifically recognizes the validity of the daywork contract, under which payment is due whether or not any work is actually performed; this is considered sufficient consideration for the guarantee of having a rig available in a tight market. Wagner & Brown v. E.W. Moran Drilling Co., 702 S.W.2d 760 (Tex.App.-Ft. Worth 1986).
The district court was within its discretion to find that through the Email' Agreement and Letter Agreement the parties changed the day rate, the effective start date, and the choice of rig, while leaving intact the original obligations under the Daywork Contract. The third assignment of error does not present manifest, reversible error.
[ uConclusion
For the reasons expressed, the judgment is affirmed. All costs are to be paid by the appellant, E & Pco International LLC.
AFFIRMED.